UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 14-60235-Bloom/Valle

UNITED STATES OF AMERICA

v.

WILLIAM PINO,

        Defendant.
_____/

### STIPULATED STATEMENT OF FACTS

If this matter were to proceed to trial, the government would prove by evidence, including testimony of cooperating witnesses, audio and video tape recordings and other evidence that, as set forth in Count 1 of the Information, from on or about April 4, 2012 and continuing through on or about June 27, 2012, in Broward and Miami-Dade Counties in the Southern District of Florida and elsewhere, defendant **WILLIAM PINO** (hereinafter referred to as "**PINO**"), did corruptly give, offer, and agree to give a thing of value, that is, $5,000 in U.S. currency to an agent of the Broward County government intending to influence and reward the agent of the Broward County government in connection with a transaction and series of transactions, that is, the purchase of eighteen (18) decorative light poles by the Broward County Traffic Engineering Division (hereinafter referred to as the "BCTED"), in violation of Title 18, United States Code, Section 666(a)(2).

During the time frame set forth in the Information the government's evidence would establish that, in or about the Broward County Government was headed by a County Commission, which consisted of a Mayor, a Vice-Mayor and seven (7) additional County Commissioners

1

representing the nine (9) districts within Broward County. The Commission appointed a County Administrator that oversaw the operations of Broward County through various departments, including the Department of Public Works (hereinafter referred to as the "DPW"). The DPW oversaw the construction and maintenance of the roadways and the seaports, the acquisition and management of property, and the water management and waste recycling systems in Broward County, among other functions. One of the divisions of the DPW is the BCTED. The BCTED was responsible for constructing, repairing, and maintaining the traffic systems and signs on the roadways in Broward County. During calendar year 2012, Broward County received benefits in excess of $10,000 under a federal program involving grants, subsidies, loans, guarantees, insurance, and/or other federal assistance.

Defendant PINO had an ownership interest and/or assisted in the operation of a number of companies in South Florida that were in the business of installing, repairing, and maintaining street lights, traffic signals, and traffic systems and the sale of products needed to make such installations and repairs, such as light poles.

An individual (hereinafter referred to as "the Lighting Contractor") was also in the business of installing, repairing and maintaining street lights, traffic signals, and traffic systems. Prior to 2012, the Lighting Contractor had partnered with PINO on numerous government projects involving street lights and traffic signals. In the past, PINO expressed to the Lighting Contractor that he would like to obtain contracts to sell his products to the county government in Broward County.

An individual who was an agent of the BCTED (hereinafter referred to as the "BCTED Public Official") was involved in the awarding of contracts related to the maintenance, repair, and construction of traffic systems, lighting and signs on the roadways in Broward County and was one

of the officials involved in the selection of contractors to work on projects for the BCTED.

## The Bribe Payment

On or about April 4, 2012, there was a consensually recorded meeting between PINO and the Lighting Contractor in Miami, Florida. The Lighting Contractor advised PINO that there were upcoming public works projects in Broward County for traffic systems, traffic signs, street lights and light poles. The Lighting Contractor further advised PINO that he had a contact in Broward County who could get the light poles sold by PINO's company written into the upcoming project. The Lighting Contractor told PINO that in order for PINO to get such a contract, PINO would need to "take care of" the public official. PINO agreed to "take care of" the public official.

On or about April 18, 2012, there was a consensually recorded meeting between PINO and the Lighting Contractor in Miami, Florida. The Lighting Contractor told PINO that Broward County was looking to replace 1400 or more light poles over the next five years, and that the BCTED Public Official could "spec" into the contract the light poles from PINO's company. The Lighting Contractor told PINO that, in the past, he has done favors for this public official. The Lighting Contractor then asked PINO "how do you want to handle it?" PINO advised that the easiest way was to "handle any transaction overseas." PINO went on to say that, "For example, uh Costa Rica. And over there I can have any kind of favors waiting for him. That's the easiest way."

On or about May 2, 2012, there was a consensually recorded meeting between PINO and the Lighting Contractor in Miami, Florida. The Lighting Contractor told PINO that the public official liked the idea of starting out with a job for fifteen to twenty (15-20) light poles. PINO said that he was willing to pay the public official $250 a pole. PINO said that the reason he previously mentioned Costa Rica is that he has connections and the infrastructure to set up in Costa Rica. PINO

stated that in Costa Rica he could set up an "anonymous corporation" "that by law the partners are not known to anybody, it's confidential." PINO stated that the corporation then opens up a bank account and gives you a debit card. You can then use the debit card to spend $1,000 a day. "It's not traceable." PINO told the Lighting Contractor that in Central America and the islands you overbid on a contract and split the difference with the public official, but in the United States you will get caught if you do it that way.

On or about May 24, 2012, there was a consensually recorded meeting between PINO and the Lighting Contractor in Miami, Florida. The Lighting Contractor told PINO that the BCTED Public Official could arrange to have a purchase order written for $100,000 in light poles for PINO's company. PINO stated that "under normal circumstances" he preferred to pay the public official after he (PINO) was paid for his services. In this instance, PINO said that he would agree to pay the public official before he (PINO) was paid, if the public official first gave him the purchase order.

PINO advised that the method of the initial payment of the public official did not need to utilize a Costa Rican "anonymous corporation." From his experience, PINO felt that the payment amount did not justify an overseas arrangement.

On or about June 5, 2012, there was a consensually recorded meeting between PINO and the Lighting Contractor in Miami, Florida. PINO told the Lighting Contractor that he would give the public official five thousand dollars ($5,000) of U.S. currency in exchange for a purchase order issued to PINO's company for $100,000 of his light poles.

On or about June 26, 2012, there was a consensually recorded telephone call between PINO and the Lighting Contractor. PINO and the Lighting Contractor arranged to meet the next day with the BCTED Public Official at a restaurant in Plantation, Florida. PINO advised the Lighting

Contractor that, prior to the meeting, he would meet the Lighting Contractor in the restaurant parking lot and give the Lighting Contractor the $5,000 bribe payment for the BCTED Public Official.

On or about June 27, 2012, there was a consensually recorded meeting between PINO, the Lighting Contractor, and the BCTED Public Official in Plantation, Florida. Approximately 12:40 p.m. PINO arrived at the restaurant parking lot and then knocked on the car window of the Lighting Contractor. PINO passed a large manilla envelope to the Lighting Contractor and said, "take that envelope." Inside the brown letter-sized envelope was a bank envelope with $5,000 in U.S. currency. PINO and the Lighting Contractor then went into a restaurant and met the BCTED Public Official. After some discussion of engineering details and PINO's products, the BCTED Public Official provided PINO with a purchase order from Broward County for PINO's company to provide Broward County eighteen (18) decorative light poles at an approximate cost of $100,000. PINO reviewed the purchase order, and the Lighting Contractor asked PINO if "we're good." When PINO responded "we're good," the Lighting Contractor slid the manilla envelope containing $5,000 in U.S. currency across the top of the table to the BCTED Public Official. After receiving the money, it was agreed that PINO could contact the BCTED Public Official directly and did not have to go through the Lighting Contractor. PINO and the BCTED Public Official then discussed the potential for future work for PINO's companies in Broward County.

This is some of the evidence the government would present if this matter were to proceed to trial. The above-described events occurred from on or about April 4, 2012 and continuing through on or about June 27, 2012, in Broward and Miami-Dade Counties in the Southern District of Florida.

WIFREDO A. FERRER
UNITED STATES ATTORNEY

Date: 6/21/13

JEFFREY N. KAPLAN
ASSISTANT UNITED STATES ATTORNEY

I have read the Stipulated Statement of Facts set forth above. I believe that the above-stated facts set forth all the elements for the offense of Bribery in Programs Receiving Federal Funds, in violation of Title 18, United States Code, Section 666(a)(2) as charged in Count 1 of the Information. I agree with all the facts set forth in the Stipulated Statement of Facts.

Date: 6/20/13

MICHAEL DUTKO
ATTORNEY FOR DEFENDANT

Date: 6/20/13

WILLIAM PINO
DEFENDANT